Filed 11/4/20  L.N. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| L.N.,<br><br>            Petitioner,<br><br>                    v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>            Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>            Real Party in Interest. | F081498<br><br>(Super. Ct. No. 01CEJ300383-3)<br><br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Brian M. Arax, Judge.

Nicole M. Verville for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]        Before Detjen, Acting P.J., Franson, J. and Meehan, J.

At a contested jurisdictional and dispositional hearing in July 2020, the juvenile court adjudged now five-year-old T.S. a dependent child under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j),[1] ordered her removed from her mother, L.N. (mother), under section 361, subdivision (c)(1) and set a section 366.26 hearing on November 17, 2020. Mother contends the evidence was insufficient to support the court's findings and orders and seeks an extraordinary writ (Cal. Rules of Court, rule 8.452)[2] vacating the section 366.26 hearing and directing the juvenile court to terminate dependency jurisdiction and return T.S. to her custody, return T.S. to her custody with family maintenance services or order family reunification services. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

On July 15, 2019, the Fresno County Department of Social Services (department) requested a welfare check on mother and then four-year-old T.S. after receiving a report of possible neglect. Mother had a significant child welfare history that included T.S. She received family maintenance services to retain custody of her from May 2016 to October 2017 and was granted sole physical and legal custody. She lost custody of T.S.'s half siblings, Christopher and B.B., in 2000 and 2001, respectively, and her parental rights were terminated. She also had a 14-year-old son and a 12-year-old daughter, N.B., who were placed in their father's care.

A social worker met with police officers at mother's apartment. An adult male opened the gate to the apartment complex for the social worker and said it was about time child protective services did something about mother and T.S. He said mother always used drugs, acted crazy and left T.S. alone. The officers found mother in front of her residence holding T.S. and behaving erratically. She was speaking very rapidly, making

---

[1]     Statutory references are to the Welfare and Institutions Code.

[2]     References to rules are to the California Rules of Court.

incoherent statements and refused to hand T.S. over to law enforcement. She admitted using methamphetamine. Concerned she was going to harm T.S., the officers involuntarily detained mother under section 5150 and the social worker took T.S. into protective custody. The whereabouts of T.S.'s father, Troy S., were then unknown.

T.S. told the social worker she got scared sometimes when mother left her alone at night but not "too scared." When she misbehaved, she was hit with a belt but denied that it hurt. She had food to eat and clean clothes to wear. N.B., her 12-year-old sister, did her laundry for her by taking her to the laundromat.

Mother denied stating she used methamphetamine. She told the social worker he had better return T.S. to her custody or she would make sure everyone knew he was a kidnapper. She reminded him she was " 'only one step away from being crazy.' "

Mel S.,[3] the girlfriend of mother's cousin and an approved foster parent, took custody of T.S. She was surprised the department had not removed T.S. sooner. She did not have much of a relationship with mother but had seen T.S. a couple of months before. Yvonne M., a maternal aunt, and Deborah P.,[4] the maternal grandmother, also expressed interest in placement. Yvonne adopted Christopher and B.B. Yvonne and Deborah were given instructions about completing the orientation and the necessary paperwork.

The department filed a dependency petition on T.S.'s behalf, citing the incident on July 15, 2019, and alleging under section 300, subdivision (b)(1) that mother's mental health issues and methamphetamine use placed T.S. at a substantial risk of harm. The petition further alleged under subdivision (j) that T.S.'s half brother Christopher was removed from mother's custody in December 2000 because of her cocaine and marijuana use and incarceration. She was ordered to participate in reunification services but did not

---

[3]    "Mel" is a nickname, which we use for nondisclosure purposes because her legal name is uncommon.

[4]    Deborah is referred to in the reporter's transcript by her maiden name, which begins with the letter "S." but everywhere else in the record as "Deborah P."

comply. Her parental rights were terminated, and Christopher was adopted. In December 2001, T.S.'s half sister, B.B., was removed after mother was arrested for not complying with her probation drug treatment. She was denied reunification services and B.B. was adopted.

The juvenile court ordered T.S. detained in July 2019 pursuant to the petition and offered mother supervised visitation and random drug testing. The court ordered the department to assess Troy for services if he made contact and set a jurisdictional/dispositional hearing (combined hearing) for August 2019. The hearing was continued and conducted as a contested, combined hearing in July 2020. During that year, mother participated in services to reunify and completed some of them. However, the department recommended the juvenile court exercise its dependency jurisdiction over T.S. and deny mother reunification services based on her untreated drug abuse and failure to reunify with T.S.'s half siblings. (§ 361.5, subd. (b)(10), (11) & (13).)

In recommending the juvenile court deny mother reunification services, the department detailed mother's child welfare history in its report for the combined hearing. In December 2000, eight-month old Christopher was taken into protective custody after mother was arrested for petty theft and a probation violation. She was also using cocaine and marijuana. Mother was ordered to participate in reunification services, including drug treatment, but did not comply. She was also exhibiting mental health problems. In January 2001, she was evaluated in the emergency room after she was found running naked in the street holding Christopher and talking about giving him tranquilizers. She was pregnant and tested positive for cocaine and marijuana. She was placed on an involuntary detention under section 5150. In January 2001, mother gave birth to B.B. at 25 weeks gestation and tested positive for cocaine. B.B. was placed with a relative as a safety plan while mother received residential drug treatment. However, mother was noncompliant. The court denied mother reunification services and terminated her parental rights as to both children. In October 2016, the juvenile court adjudged T.S. a

4.

dependent while mother was court-ordered in a criminal matter to complete substance abuse treatment as a condition of probation. The court allowed mother to retain custody of T.S. while participating in family maintenance services, which included inpatient drug treatment. Mother successfully completed residential treatment and moved in with her family. However, in February 2017, she tested positive for methamphetamine, cocaine and benzoylecgonine. Mother agreed to attend outpatient substance abuse treatment and was placed on family maintenance. Fresno County accepted the case in May 2017 and dependency was dismissed in October 2017.

The department also reported on mother's efforts to address its concerns about her substance abuse and mental health. She registered for random drug testing in July 2019 and tested positive for marijuana from July through September. She began outpatient substance abuse treatment in September 2019 and actively participated. She completed treatment in December 2019. During that time and continuing into January and February, she attended Narcotics Anonymous/Alcoholics Anonymous (NA/AA) meetings. She consistently tested negative for all drugs from late September 2019 through April 2020, except for positive test results for creatinine in January and March 2020. However, she refused to participate in mental health therapy. She was referred to a therapist by her substance abuse counselor because of her history of involuntary detentions but declined to complete the assessment and denied symptoms of anxiety and/or depression. She told the therapist she was released from involuntary detention in July 2019 without a psychiatric diagnosis or psychotropic medication. The therapist explained in a letter that she felt ethically bound to respect mother's decision to refuse therapy. Mother completed a 12- to 15-week parenting class in January 2020 and enrolled in "Beyond Trauma," a 12-week class for women who experienced trauma.

Despite mother's efforts, the department advised against providing mother reunification services. Although she had a good relationship with T.S. and interacted well with her, mother made bizarre statements to the staff during a visit in July 2019.

She said she had a 23-year-old daughter who was hit by a train. She also said she paid $1,000 a week for shots so that she could get pregnant with T.S., who she said died when she was two months old. T.S. meanwhile remained in Mel's care and was doing well there. Mel, however, was only willing to provide her a permanent plan of legal guardianship. Nevertheless, the department did not believe it would serve T.S.'s best interest to provide mother services to reunify.

In an addendum report, the department informed the juvenile court Troy was in custody in county jail for threatening someone with brass knuckles. The department recommended the court deny him services because he was not seeking placement of T.S. If he sought placement, it recommended the court deny him services because of a violent felony conviction. (§ 361.5, subd. (b)(12).) The department also reported T.S. consistently expressed her desire not to reunify with mother. She was afraid of mother and disclosed mother hit her and did not feed her. She felt loved and cared for by Mel and her uncle. She thought mother was nice to her during visits because she wanted her to return home. T.S. no longer considered mother part of her family but wanted to continue visiting her.

In May 2020, mother gave birth to a daughter, M.M. The department took her into protective custody and the juvenile court ordered her detained pursuant to a dependency petition. The court ordered the department to offer mother random drug testing and arrange visitation. The court set the jurisdictional/dispositional hearing (initial, combined hearing) for July 27, 2020.

The juvenile court conducted the contested, combined hearing as to T.S. and the initial, combined hearing as to M.M. on July 27 and 28, 2020. Troy appeared through his attorney, who stated Troy was available to take custody of T.S. and objected to the court setting a section 366.26 hearing. Mother attempted to show there was insufficient evidence she had drug abuse or mental health problems.

6.

Tyrone J., mother's uncle, testified he and mother lived in the same apartment complex. He saw mother with T.S. on July 15, 2019, and did not see any signs mother was under the influence. He was not aware mother had a history of methamphetamine use.

Deborah, the maternal grandmother, testified she took care of T.S. the week before the July 15 incident. She had dropped T.S. off with mother and was on her way home when she received a telephone call that the police and department were at mother's apartment. She regularly took care of T.S., twice during the weekdays and every Saturday. Sometimes she spent the night. She was aware mother was having difficulty with the neighbor who told the police mother left T.S. alone. Mother told her the man flirted with her. However, Deborah did not believe the man would know if she was in mother's apartment taking care of T.S. She did not get a chance to tell anyone that she could take care of T.S.

Deborah acknowledged mother previously used drugs "off and on" but said she was not currently using drugs. She denied mother ever had any mental health problems. Asked whether she applied for placement, she said she tried. She went to a school and received a certificate, but it was "too much" for her.

Social worker Fatima Castillo Rosales was assigned T.S.'s case after detention. When she received the case, T.S. was already placed with Mel. T.S. went through a period of adjustment in Mel's care but had since adjusted well and was afraid she would be taken out of her care. When T.S. got into trouble at school, she would say "I don't want to go back home." "I love you guys." She told Rosales she wanted to stay with Mel every time Rosales visited her. Rosales believed it would be detrimental to T.S. to remove her from Mel's care.

Social worker Kenia Gonzalez was assigned T.S.'s case in May 2020. She supervised two telephone visits between mother and T.S. The visits were short because T.S. wanted to terminate the call. T.S. did not want to visit mother and had to be urged to

visit by Mel. T.S. said she did not have anything to say to her mother. T.S. told Gonzalez she did not want to go home. She wanted to stay with "auntie Mel" and start calling her "mom."

R.M., mother's 22-year-old nephew, testified he asked about placement sometime in January or February 2020 but was told T.S. was in the process of being adopted by another family and happy where she was. He could not remember the name of the social worker, but she did not tell him about the resource family approval process. He never requested visitation.

Yvonne, mother's older half sister, testified she adopted Christopher and B.B. and obtained legal guardianship of mother's 13- and 15-year-old sons. She provided in-home supportive services and worked with people who had mental illness. She took a couple of classes and sat in on private counseling sessions. She also worked with her brother, who was a paranoid schizophrenic, for 20 years beginning when he was 16. She never observed mother display behavior related to a mental health problem. She and mother were close, and she interacted with her often. She had never been around mother when mother was misusing any sort of illegal substance. She interacted with mother once or twice when she believed she was under the influence of marijuana. She never suspected mother of being under the influence of methamphetamine or cocaine.

Mel testified she participated in therapy with T.S. and T.S. never talked about going home to mother.

Mother testified she contacted the police on July 15, 2019, because her 15-year-old son was threatening to run away and was acting out of character. The police told her they received a phone call from a neighbor and wanted to talk to her and walk through her apartment. She did not know which neighbor called but had problems with a neighbor who was standing at the front gate with a camera videotaping. She denied being under any mind-altering drugs at the time. She used marijuana two days before but T.S. was not in her care when she used it. She denied ever using marijuana with T.S. present.

8.

She denied telling the officer she used methamphetamine. She stayed at the psychiatric facility two nights. The doctor told her she did not need to be there and released her. The court took judicial notice that the maximum allowable detention under section 5150 was 72 hours.

Mother claimed a sobriety date of sometime "around the 13th of July" 2019. Marijuana is her drug of choice. She did not believe she was addicted to it because she did not use it daily. She quit using marijuana on her own and tested positive for it until it cleared her system. She continued to attend NA/AA meetings. She denied ever having a problem with methamphetamine. She acknowledged testing positive for creatinine. However, she attributed the result to being pregnant and drinking a lot of water. She did not pursue mental health counseling because she did not believe she had mental health problems. During visits, T.S. always asked mother if she could come home.

Deneen D., a family friend, testified she supervised visits between mother and T.S. and observed them play and interact well. She never asked for placement.

Mother's attorney argued there was insufficient evidence mother had a substance abuse problem or untreated mental health problems that affected her ability to safely parent T.S. She pointed to evidence mother had not tested positive for any elicit substance except marijuana initially and creatinine while she was pregnant. Mother's behavior on July 15 could be explained by her confusion as to why the police were asking about T.S. and the stress of her neighbor filming her rather than by mental illness. She also pointed out that mother was not detained for the full 72 hours, indicating the psychiatrist did not believe she was dangerous to herself or others. Counsel also argued the juvenile court should provide mother reunification services because she was making efforts to address the department's concerns and it was in T.S.'s best interest to reunify with her. They enjoyed positive visitation and had a parent-child relationship.

The juvenile court exercised its dependency jurisdiction over T.S. after finding true the section 300, subdivision (b)(1) and (j) allegations. The court cited mother's

history of mental illness and substance abuse and failure to acknowledge the problems. The court did not find Deborah and Yvonne's testimony concerning mother's substance abuse and mental illness credible. The court ordered T.S. removed from parental custody and declined to deny mother reunification services under section 361.5, subdivision (b)(10) and (11), finding she made reasonable efforts in the year following detention to resolve her problems. However, the court found subdivision (b)(13) of section 361.5 applied because mother resisted court-ordered drug treatment by relapsing in 2017. The court also found providing mother reunification services would not serve T.S.'s best interest, given the unstable life she experienced with mother and multiple removals from mother's custody. The court denied Troy services under 361.2, subdivision (a) because he was not requesting placement or services, set a section 366.26 hearing as to T.S. for November 17, 2020, and a contested, combined hearing for M.M. on November 10, 2020.

## DISCUSSION

On appeal, we review jurisdictional and dispositional findings and orders under the substantial evidence standard of review. (*In re A.S.* (2011) 202 Cal.App.4th 237, 244.) Substantial evidence exists when the evidence is "reasonable in nature, credible, and of solid value," so that "a reasonable mind would accept [it] as adequate to support [the] conclusion." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under this standard of review, we consider the record as a whole, in a light most favorable to the juvenile court's findings and conclusions, and we defer to the juvenile court on any issues of credibility of the evidence. (*In re Tania S*. (1992) 5 Cal.App.4th 728, 733–734.) The existence of evidence of some support for a contrary finding will not defeat the finding. (*In re Manuel G*. (1997) 16 Cal.4th 805, 823.) Moreover, "[w]hen the sufficiency of the evidence to support a finding or order is challenged on appeal, even where the standard of proof in the trial court is clear and convincing evidence, the reviewing court must determine if there is any substantial evidence—that is, evidence which is reasonable, credible and of solid value—to support the conclusion of the trier of fact." (*In re Jasmine*

*C.* (1999) 70 Cal.App.4th 71, 75.)  However, we bear in mind that the juvenile court was required to make the finding on the heightened clear and convincing evidence standard of proof.  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

## I.    Jurisdictional Findings

Mother contends there was insufficient evidence to support the section 300, subdivision (b)(1) findings and a subdivision (j) finding alone cannot support jurisdiction. We disagree the evidence was insufficient.

At the jurisdictional stage of a dependency proceeding, the department must prove by a preponderance of the evidence that the child is a dependent of the court as described by section 300.  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)  Section 300, subdivision (b)(1), authorizes a juvenile court to exercise dependency jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent … to adequately supervise or protect the child, or … by the inability of the parent … to provide regular care for the child due to the parents … mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b)(1).)

The department alleged two counts under section 300, subdivision (b)(1), one alleging mother's mental health issues and the other alleging her methamphetamine use negatively affected her ability to provide T.S. adequate care, supervision and protection. As factual support, the department cited her behavior on July 15, 2019, when she was observed speaking very rapidly, moving continuously, making incoherent statements, and refusing to physically hand T.S. over to law enforcement and her statement she used methamphetamine.

Mother contends her demeanor and statements on July 15, 2019, are insufficient alone to support a true finding under section 300, subdivision (b)(1).  Rather, she argues, it required evidence she was using drugs or experiencing mental illness at the time of the jurisdictional hearing, which the department did not present.  There was, for example, no

evidence she required involuntary detention during the year following T.S.'s removal. Further, she asserts, the only drug found in her system was marijuana and only during the first several months of the case. Nevertheless, she argues, the juvenile court considered her marijuana use as ongoing drug use and prejudiced her when it took judicial notice, stating "I think the [c]ourt can take judicial notice it's not subject to dispute but you are taught in drug treatment once an addict that's it. No alcohol, no marijuana, no mind[-] altering substances or sobriety substances." Mother acknowledges testing positive for creatinine, which she attributes to her pregnancy and additional water consumption.

Mother's assertions concerning her ongoing substance abuse and mental illness was scant at the time of the jurisdictional hearing but has some merit. What she fails to acknowledge, however, is the probative value of her mental health and substance abuse history and denial she ever used methamphetamine or suffered mental health problems.

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection. [Citations.] A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' " (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) Further, a parent's denial of wrongdoing or failure to recognize the negative impact of her conduct is also a relevant consideration in the court's determination of risk under section 300. (*In re Tania S.*, *supra*, 5 Cal.App.4th at p. 735, fn. 4; see also *In re A.F.* (2016) 3 Cal.App.5th 283, 293 [" '[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision.' "].)

Here, mother's history of mental health problems and substance abuse is significant and longstanding, dating back to 2000 when she was pregnant with B.B. and

12.

using cocaine. She had to be involuntarily detained because she was running naked in the street while holding then eight-month-old Christopher and talking about giving him tranquilizers. There is a long gap in her subsequent history until approximately 16 years later when she was court ordered to complete substance abuse treatment as a condition of probation. Though she completed the program, she quickly relapsed, testing positive for methamphetamine, cocaine and benzoylecgonine in early 2017. By her own admission, she was again using methamphetamine in July 2019 when officers responded to her home and apparently it had been going on for some time based on the comments of mother's neighbor and Mel. Mother was also acting erratically, which prompted her involuntary detention.

Despite mother's history of involuntary detention, she denied having any mental health problems. She denied suffering from depression and anxiety and declined to complete the mental health assessment. Nevertheless, one could infer from the therapist's letter she thought mother may have some mental health problem but was unable to identify or treat it. She felt compelled to explain ethical reasons required her to honor mother's refusal for treatment. In addition, mother testified she did not believe she had a problem. Two involuntary detentions are compelling evidence, however, that she did. There are also the statements she made to the staff during visitation in July 2019 that would indicate she was not accurately perceiving reality.

Mother also denied having any problem with methamphetamine and she did not believe she was addicted to marijuana because she did not use it every day. The juvenile court considered her continuing use of marijuana inconsistent with recovery on a theory that an addict should avoid any mind-altering substances. Even if, as mother argues, the court erred in taking judicial notice of that concept, it does not undermine the court's assumption of jurisdiction. Mother's denial of having mental health problems considering her history was sufficient evidence she posed a substantial risk of harm to T.S. " '[D]enial is a factor often relevant to determining whether persons are likely to

13.

modify their behavior in the future without court supervision.' " (*In re A.F.*, *supra*, 3 Cal.App.5th at p. 293.)

## II. Removal Order

Mother contends the juvenile court's finding mother made reasonable efforts to treat the problems necessitating the removal of T.S.'s siblings by extension proved T.S.'s removal from her custody was unnecessary. We disagree.

The juvenile court must decide at the dispositional hearing whether to remove the child from parental custody and whether to provide the parent(s) reunification services. If the juvenile court finds the minor child is described under any one of the subdivisions of section 300, it may remove the child from the parent but only if it finds, by clear and convincing evidence, there is or would be a substantial danger to the child's physical or emotional well-being if the child were returned home and there are no reasonable means by which the child's physical health can be protected short of removal. (§ 361, subd. (c)(1).) If the court orders the child removed, it must order services for the parent to reunify with the child, unless any one of the exceptions listed in section 361.5, subdivision (b) apply.

Here, the juvenile court declined to apply section 361.5, subdivision (b)(10) and (11) to mother. These exceptions apply to the parent whose parental rights or reunification services were terminated in the case of a sibling or half sibling of the child under consideration and the parent failed to subsequently make reasonable efforts to address the problems leading to removal of the sibling or half sibling. The juvenile court found the exceptions did not apply to mother because in the year following T.S.'s detention, she made efforts to treat her drug abuse.

Mother's efforts, however, do not undermine substantial evidence T.S. would be at a substantial risk of harm if returned to her custody. Though she was making efforts to treat her drug abuse, she refused to address her mental health condition, which was potentially serious. Twice it required her to be involuntarily detained. Further, T.S. had

been removed from mother's custody twice and she was fearful of being returned to her. To remove T.S. from a home where she felt safe to place her in a precarious situation with mother would not best serve and protect her interest. We find no error.

We conclude substantial evidence supports the juvenile court's exercise of its dependency jurisdiction over T.S. and its order removing her from parental custody. Since mother does not challenge the court's order denying her reunification services, we need not review it. We thus affirm the court's findings and orders and deny the extraordinary writ petition.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).